581 So.2d 497 (1990)
James Wyman SMITH
v.
STATE.
5 Div. 458.
Court of Criminal Appeals of Alabama.
August 24, 1990.
Rehearing Denied October 12, 1990.
*500 J. Michael Williams, Sr. and Thomas E. Jones, Auburn, for appellant.
Don Siegelman, Atty. Gen., and P. David Bjurberg and William D. Little, Asst. Attys. Gen., for appellee.
TYSON, Judge.
James Wyman Smith was charged by indictment with capital murder committed during a kidnapping in the first degree, in violation of § 13A-5-40(a)(1), Code of Alabama 1975. The petit jury, at the conclusion of the guilt phase of the trial, found the appellant "guilty as charged in the indictment" and, during the sentencing phase, recommended that he be sentenced to death. The trial judge accepted the jury's recommendation and sentenced the appellant to death by electrocution.
The evidence at trial indicated that, on August 31, 1984, Linda Long Talbert was abducted from Flowers Bait Store in Lee County, Alabama. Linda Talbert, the victim, worked as the store clerk from 6:00 a.m. to 2:00 p.m.
Odell White, a frequent customer of the store, stopped by sometime after 10:00 a.m.[1] on August 31, 1984. Donnie Ray *501 Buchanan, who knew the victim and the proprietors of the store, entered immediately after White. Linda Talbert was not in the store. The two men looked in and around the store but were unable to find her.
Buchanan then went to Billy Ray Flowers home, which was approximately onequarter mile away. Flowers, the owner of the store, returned to the store with Buchanan. Upon confirming that Linda Talbert was not there, he checked the cash register but did not find any money missing. He also spotted Linda's purse behind the check-out counter. He then called the Lee County Sheriff's Department.
Jerry Kay Davis, a carrier for the Columbus Ledger newspaper, was servicing her route when she spotted a pair of white ladies' tennis shoes lying beside the road. Captain Paul Dennis, with the Lee County Sheriff's Department, took possession of the shoes on September 1, 1984. He took the shoes to Donnie Talbert, the victim's husband, who identified the shoes as belonging to his wife.
On September 2, 1984, a search party was organized to search for Linda Talbert. The search focused on the area where the tennis shoes were found, particularly two dirt roads which ran off of the main highway.
Dan Perry and John Shavers, two members of the search group, were driving down one of the dirt roads, commonly called Ghost Town Road, when they noticed a set of tire tracks leading off the road into an adjoining field. The men parked their automobile and, on foot, followed the tire tracks. After walking a short distance off the road, Shavers spotted a body, which was later identified as that of Linda Talbert. They notified the deputies in the area, who came to that location and secured the scene.
On December 4, 1984, the appellant attempted to burglarize an apartment in Auburn, Alabama. During the burglary, the appellant got into an altercation with an Auburn University female student. The appellant fired a shot from his pistol. The appellant fled the scene in his 1980 Dodge St. Regis automobile. An Auburn police officer, Andy Thee, pursued the appellant. During the high-speed pursuit, the appellant wrecked his car. He parked his car in someone's yard and fled on foot. He was located the following day, December 5, 1984, and was arrested. He pleaded guilty to this burglary and received a sentence of life imprisonment without parole.
The appellant's automobile was impounded at the Auburn city lot. While it was in impound, someone noticed that the automobile had Blue Streak radial tires on the front and bias tires on the rear. The tire prints from these tires seemed to match the tire prints at the scene where Linda Talbert's body was found.
Impressions were made of the automobile's tire prints and photographs were taken. These photographs, along with photographs of the tire prints found at the crime scene, were submitted to George Thomas Caddote, the manager of marketing and engineering of Kelly Springfield Tire Company. Cadotte testified that the tire prints found at the scene were partially made by a Goodyear Blue Streak radial tire. He explained that this type of tire was a police pursuit tire sold by Goodyear and placed only on police vehicles.[2] Cadotte stated that the Blue Streak has an imprint different from that of all other tires.
Based upon the similarities of the tire prints, Lieutenant Jay Jones checked the registration on the automobile. He discovered that the car was registered to Margaret Christine Smith, the appellant's wife. He obtained a consent to search the automobile *502 from Margaret Smith. Thereafter, he, together with a team of trace evidence analysts from the Department of Forensic Sciences, searched the car and removed some fibers and hairs from the automobile. These fibers and hairs were later compared to fibers and hairs taken from the body and clothing of Linda Talbert. Based on these comparisons, the analysts were able to identify seven fibers and hairs with similar or very similar qualities.
Following the appellant's arrest for the burglary in Auburn, he was placed in a cell in the Lee County jail with Marion Sanford Enfinger. The appellant and Enfinger remained cellmates from December 1984 until February 1985. Enfinger testified that during this period of time the appellant expressed his concern that the police suspected him of killing Linda Talbert. Enfinger claimed that he told the appellant that he did not have anything to worry about if he did not kill her. To this, Enfinger testified, the appellant responded, "I did do it." (R. 1307, 1397.)
According to Enfinger, the appellant stated that he went into Flowers store to buy a soft drink and some cigarettes. He noticed that the clerk was alone, so he pulled his pistol out and said, "You're going with me." The appellant then allegedly told Enfinger that he took her down a dirt road in a vacant field, took her clothes off, attempted to have intercourse with her, and then strangled her with her brassiere. (R. 1331-34, 1404-07.)
Enfinger also testified that the appellant made several other incriminating statements to him, including: (1) that he was involved in an incident in Columbus, Georgia, with a detective's wife; (2) that the gun he used in the Auburn burglary and the abduction of Linda Talbert were one and the same; (3) that he pleaded guilty to the burglary charge in hopes that the police would quit pursuing him on the Talbert case; and (4) that after he killed Linda Talbert he realized that her shoes were still in his car, so he set them out beside the road.
The State also called J.F., an employee of Brown Real Estate Agency in Columbus, Georgia. She testified that she got to work about 9:00 a.m. on August 31, 1984. Shortly thereafter, a man came into her office, brandishing a pistol. J.F. testified that the appellant tried to rape her and made her perform oral sex on him. J.F. stated that her husband was a police officer with the Columbus Police Department at the time.
After the appellant was arrested in December 1984, J.F. went to the Lee County, Alabama, sheriff's department, where she identified this appellant as her assailant. She also made an in-court identification of him.
The appellant, at trial, called several witnesses to attempt to establish that it would have been impossible, time-wise, for him to have committed the crime in Columbus, Georgia, and then, on the same morning have committed the murder of Linda Talbert. Among these witnesses were his sister and his aunt, both of whom stated that the appellant came to their homes on the morning of August 31, 1984, and the appellant's stepson-in-law, who measured distances and times between relevant points in Columbus and Lee County.
The appellant also called Dr. David Michael Hall, an expert on fiber and hair analysis, to explain the fiber production process. Dr. Hall's testimony was obviously elicited to attempt to off-set the testimony of Tellis Hudson and John Kilbourn with the Department of Forensic Sciences. Both Hudson and Kilbourn examined the hairs and fibers and found seven samples taken from the appellant's automobile which were similar or very similar to those hairs and fibers removed from the victim's body and clothing. Dr. Hall, however, stated that he found no "significant dissimilarities" between the questioned and known hairs and fibers. In fact, he stated: "The fact that we had all of these fibers together at one time is probably significant." (R. 1630.)
Based on this evidence, the jury found the appellant guilty of the capital murder of Linda Talbert. He now appeals from this conviction.
*503 The appellant raises numerous issues in his brief. We note that a number of these matters were not raised at trial by timely objection. Nonetheless, as this court stated in Hooks v. State, 534 So.2d 329, 351-52 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989):
"However, since this is a death case, we must review the error before us to see if it constitutes plain error and, thus, should be noticed despite the lack of a proper objection by defense counsel. Rule 45A, A.R.A.P. In considering what constitutes `plain error' in a capital case, the Alabama Supreme Court has looked to the federal court's interpretation of what is `plain error.' See Ex parte Harrell, 470 So.2d 1309 (Ala.1985); Ex parte Womack, 435 So.2d 766 (Ala.1983).
"In United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the Supreme Court stated that the plain error doctrine should be used to correct only `particularly egregious errors' (quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)) which are those errors that `seriously affect the fairness, integrity or public reputation of judicial proceedings' (quoting United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). Young, supra, 105 S.Ct. at 1046-47. The plain error rule should be applied `solely in those circumstances in which a miscarriage of justice would otherwise result.' Young, supra, 105 S.Ct., at 1047 (quoting Frady, supra, 456 U.S. at 163, n. 14, 102 S.Ct. at 1592, n. 14).
"Furthermore, the court noted that the plain error doctrine requires that the `claimed error not only seriously affects "substantial rights" [of the defendant], but that it had an unfair prejudicial impact on the jury's deliberations. Only then would [a] court be able to conclude that the error undermined the fairness of the trial and contributed to a miscarriage of justice.' Young, supra, 105 S.Ct., at 1047, n. 14."

I
The appellant first contends that the police requestioned him after he asserted his right to counsel, in violation of his constitutional rights and in violation of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).
Our review of the transcript fails to disclose any facts supporting this appellant's claim. In fact, the appellant wholly failed to include any factual data to support his claim in his brief. (See Appellant's brief at 41.) The page numbers to the record cited in the appellant's brief concern the testimony of Marion Enfinger, a former cellmate of this appellant. The appellant in no way has shown this court that Marion Enfinger was an agent of the police. Thus, the appellant is not due to prevail on this claim. See McCall v. State, 501 So.2d 496, 500 (Ala.Cr.App.1986), cert. denied (Ala. 1987).

II
The appellant contends that two prospective jurors, Watkins and Turner, should have been struck for cause, because both indicated that they knew members of the victim's family.
The party seeking to challenge a juror for cause must show that the questioned juror is due to be struck under § 12-16-150, Code of Alabama 1975, or on common law grounds. See Kinder v. State, 515 So.2d 55, 60 (Ala.Cr.App.1986), cert. denied (Ala.1987). Our review of the record fails to indicate that the appellant attempted to challenge either juror for cause; therefore, to prevail, the appellant must show that the trial court's failure to remove sua sponte the two prospective jurors was "plain error."
We find no error, since both jurors stated that their limited knowledge about the case and their limited acquaintance with the victim's family members would not affect their verdict. (R. 131-32, 141.) "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. 717, 723, *504 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). See also Johnston v. State, 497 So.2d 844, 849 (Ala.Cr.App.1986) (a juror "is not disqualified if he states that he can find a true verdict on the evidence alone"); Stringfellow v. State, 485 So.2d 1238, 1241 (Ala. Cr.App.1986) (a juror who stated she would "try real hard" to put her personal bias aside was not due to be dismissed for cause).
Furthermore, Watkins did not serve on the ultimate petit jury. See Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) (no error where the appellant had to use peremptory challenges to remove jurors he argued should have been removed for cause). Turner, on the other hand, did serve on the jury which convicted and recommended the death sentence. Nonetheless, since the appellant has failed to show that he was biased or prejudiced, he is not due to prevail on this issue.
The trial judge's failure to remove either juror for cause was therefore not error on either statutory or common law grounds.

III
The appellant next alleges that the trial court committed reversible error by failing to ask a "reverse-Witherspoon" question of the veniremen. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
The voir dire examination of the jury consisted of three parts. First, the venire panel was asked general questions by the trial judge, the district attorney, and defense counsel. During this stage, the trial judge asked:
"Do you have a fixed opinion against the imposition of capital punishment, that is the imposition of the death penalty?" (R. 138.)
Next, the venire panel was split into four groups (groups of 14, 14, 14, and 12, respectively), and the trial judge, district attorney, and defense counsel asked more specific questions. During the voir dire examination of each group, the district attorney asked the veniremen the following:
"All right, now, also, based on your moral convictions or religious beliefs, are you so conscientiously opposed to the death penalty that you could not vote to impose the death penalty, regardless of your oath as a juror, the facts of this case, or the instructions give[n] to you by the Court? In other words, are you so opposed to the death penalty; that is, you absolutely do not believe in it; that regardless of what the facts in this were, or the Court's instructions, you do not feel that under any set of circumstances you could ever vote to impose the death penalty? Are there any of you on the jury that feel that way?" (R. 206-07, 261, 326-27, 412.)
Finally, based upon their answers to the district attorney and defense counsel's specific questions, individual veniremen were called back for further voir dire examination. At no time during this process did defense counsel seek to elicit the jurors' opinions on the death penalty, outside those questions asked by the trial judge and the district attorney. Likewise, defense counsel never requested the trial judge to ask a "reverse-Witherspoon" question to the panel of potential jurors.
Nonetheless, the appellant now claims that the trial judge has the duty to ask the venire panel a "reverse-Witherspoon" question. In support of his argument, the appellant relies on United States v. Van Scoy, 654 F.2d 257, 262 (3rd Cir.), cert. denied, 454 U.S. 1126, 102 S.Ct. 977, 71 L.Ed.2d 114 (1981):
"Thus, where the death penalty is a possibility, the trial judge should examine the prospective jurors to ascertain whether any of them would clearly vote against imposition of the death penalty regardless of the evidence (Boulden v. Holman, 394 U.S. 478, 482, 89 S.Ct. 1138, 1140-41, 22 L.Ed.2d 433 (1969); Witherspoon v. Illinois, 391 U.S. 510, 520, 88 S.Ct. 1770, 1776, 20 L.Ed.2d 776 (1968)); and such jurors can be stricken for cause (Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); United States v. Odom, 348 F.Supp. 889, 894 (M.D.Pa.1972), aff'd, 475 F.2d 1397 (3d *505 Cir.), cert. denied, 414 U.S. 836, 94 S.Ct. 182, 38 L.Ed.2d 72 (1973))."
(Footnotes omitted.)
In this regard, the appellant argues:
"Likewise, a trial court violates a capital defendant's rights guaranteed him under the United States Constitution and Alabama law if it fails to inquire of prospective jurors if they are excludable under the Adams [v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980),] standard by reason of their unequivocal bias for capital punishment."
(Appellant's brief at p. 42.)
Furthermore, the appellant cites this court to Hance v. Zant, 696 F.2d 940, 956 (11th Cir.), cert. denied, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983), which states, in relevant part:
"We read Adams v. Texas, supra, 448 U.S. at 45, 100 S.Ct. at 2526, to suggest that if veniremembers cannot be excluded because of their views against the death penalty unless those views would substantially impair the performance of their duties, the same standard should apply to a veniremember in favor of the death penalty. A person who favors the death penalty can be entrusted to make the choice between death and life imprisonment unless that person's bias for capital punishment is unequivocal and absolute. See Witherspoon, supra, 391 U.S. at 519, 522 n. 21, 88 S.Ct. at 1775, 1777 n. 21."
(Footnotes omitted.)
This issue has heretofore been addressed by this Court in Bracewell v. State, 506 So.2d 354 (Ala.Cr.App.1986), cert. denied (Ala.1987). In Bracewell, the appellant was convicted for capital murder and was sentenced to death, but this Court reversed that conviction. On retrial, the appellant was again convicted of capital murder but received a sentence of life imprisonment without parole.
In Bracewell, 506 So.2d at 358, we stated:

"Upon proper request, a jury venire in a capital case should be questioned as to whether or not any venireperson has a fixed opinion in favor of capital punishment. The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is `whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."` Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). `All veniremen are potentially biased. The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to either side of the case.' Smith v. Balkcom, 660 F.2d 573, 578 (5th Cir. 1981), cert. denied, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982) (emphasis in original). `A venireman who believes that the death penalty should automatically and in every case flow from conviction of first degree murder must be excused. See Stroud v. United States, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919); Crawford v. Bounds, 395 F.2d 297 (4th Cir.1968), cert. denied, 397 U.S. 936, 90 S.Ct. 941, 25 L.Ed.2d 117 (1970).' Alvord v. Wainwright, 564 F.Supp. 459, 487 (M.D.Fla.1983), affirmed in part, reversed in part on other grounds, 725 F.2d 1282 (11th Cir.), cert. denied, Alvord v. Wainwright, 469 U.S. 956, 105 S.Ct. 355, 83 L.Ed.2d 291 (1984). `It is error to deny the defense the opportunity to seek to determine whether a prospective juror would under no circumstances recommend mercy in the event the defendant is found guilty of the capital crime charged.' 47 Am.Jur.2d Jury § 290 (1969). See also Annot., 48 A.L. R.2d 560, §§ 7 and 11 (1956)."
(Emphasis added in part.)
The primary difference between Bracewell and this case is that, in this case, the appellant was sentenced to death. Both cases, however, involved capital murder convictions.
In selecting a jury in a capital murder case, the trial judge and the attorneys must know that a recommendation of death by *506 the jury is a real possibility. Furthermore, when jurors have taken an oath, promising to follow the instructions of the trial court, we will presume that they did just that, absent a showing to the contrary. The burden of either asking or having the trial judge ask a "reverse-Witherspoon "question lies with the appellant. Bracewell. See Corn v. Zant, 708 F.2d 549, 565 (11th Cir.1983), cert. denied, 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984), vacated in part sub nom. Corn v. Kemp, 772 F.2d 681 (11th Cir.1985), cert. granted and vacated, 478 U.S. 1016, 106 S.Ct. 3326, 92 L.Ed.2d 732 (1986), on remand, 837 F.2d 1474 (11th Cir.), cert. denied, 486 U.S. 1023, 108 S.Ct. 1997, 100 L.Ed.2d 228 (1988); Freeman v. State, 555 So.2d 196, 205 (Ala.Cr.App.1988), aff'd, 555 So.2d 215 (Ala.1989), cert. denied, ___ U.S. ___, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990) [quoting In re Shriner, 735 F.2d 1236, 1241 (11th Cir.1984) ("Under Witherspoon a defendant in a capital case has no right to jurors... whose sentencing decision is unalterably pre-determined in the defendant's favor.")]. See also Martin v. State, 548 So.2d 488, 490 (Ala.Cr.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, ___ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989); Wright v. State, 494 So.2d 726, 741 (Ala.Cr. App.), aff'd, 494 So.2d 745 (Ala.1986), cert. denied, Wright v. Alabama, 479 U.S. 1101, 107 S.Ct. 1331, 94 L.Ed.2d 183 (1987). Cf. People v. Jones, 169 Ill.App.3d 883, 120 Ill.Dec. 563, 524 N.E.2d 593, cert. denied, 121 Ill.2d 578, 122 Ill.Dec. 443, 526 N.E.2d 836 (1988) (where that court addressed a similar issue and found no reversible error by the trial judge's failure to "life qualify" a jury).
Where an appellant is sentenced to death and fails to raise a claim or an objection at the trial level, he still has the benefit of the "plain error" rule. We have reviewed the appellant's claim, and we find no "plain error" by the trial judge's failure to ask sua sponte a "reverse-Witherspoon" question. The appellant has made no showing of proof that any of the jurors so favored the death penalty that they could not have followed the trial judge's instructions and considered a sentence of life imprisonment without parole. The appellant is thus not due to prevail on this claim.

IV
Prior to trial, the appellant moved to change the venue from Lee County, Alabama. He argued that several newspaper articles had been printed about the case, thus exposing the prospective jurors to facts about this case. Specifically, he argued that some of the articles referred to the defendant's prior criminal record, and this fact, according to the appellant, was so prejudicial to him as to warrant removal of this case from Lee County.
Our review of the record convinces us that the trial judge properly denied the appellant's motion. By our count, 20 of 52 veniremen claimed that they had heard something about the abduction and murder of Linda Talbert, either in newspaper articles, on television, or by word of mouth.
Only one potential juror expressed an inability to set aside what she had heard, and she was dismissed on challenge for cause by the appellant. Furthermore, only one potential juror stated that she remembered reading that the person arrested (i.e., the appellant) had previously been in prison. This venireman was not challenged for cause, but was obviously struck by peremptory challenge, because she did not serve on the petit jury. The remaining 18 jurors either stated that they could put their knowledge of the case aside or were not asked if they could.
A challenge to a trial court's refusal to grant a motion for change of venue must be measured by the test set out in Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, Grayson v. Alabama, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985). In Grayson, 479 So.2d at 80, the Alabama Supreme Court opined:
"`Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983). In *507 order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Franklin v. State, 424 So.2d 1353 (Ala. Crim.App.1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Crim.App.1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961):
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'
"The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, `[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim. App.1978)."
See Ex parte Whisenhant, 555 So.2d 235, 238 (Ala.1989), cert. denied, ___ U.S. ___, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990); Arthur v. State, 472 So.2d 650, 658-59 (Ala. Cr.App.1984), rev'd on other grounds, 472 So.2d 665 (Ala.1985). Nelson v. State, 440 So.2d 1130 (Ala.Cr.App.), cert. denied (Ala. 1983).
The appellant has failed to show that any of the jurors' opinions were so fixed that they were unable to return a verdict based solely on the evidence presented at trial. See Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984). Therefore, he is not due to prevail on this issue. Robinson v. State, 430 So.2d 883 (Ala.Cr.App.), cert. denied, (Ala.1983).

V
Following the burglary in Auburn, Alabama, which led to this appellant's arrest, a high speed chase ensued between an Auburn police officer and this appellant. The appellant was driving a 1980 Dodge St. Regis automobile, which he crashed into a dump truck. He continued, however, for a short distance. He then pulled into someone's yard (whom he did not know), threw the keys on the ground, and ran from the police officer.
The police impounded the appellant's automobile. Upon checking the registration, the police discovered that the automobile was registered in the appellant's wife's name. Shortly thereafter, upon request by the police, the appellant's wife signed a consent-to-search-form. The subsequent search of the automobile uncovered incriminating evidence against the appellant, particularly the hairs, fibers, and the tire prints (which have heretofore been described).
The appellant, at trial, moved to suppress any evidence taken from this automobile, claiming that the vehicle was searched in violation of his constitutional rights. The State pointed out both the signed consent form and the fact that the appellant voluntarily abandoned his automobilegrounds the State argues individually support the search of the appellant's automobile.

A
Our review of the facts and evidence relevant to this issue leads us to conclude that the trial judge correctly denied the appellant's motion to suppress and correctly overruled his objections to the admission of the challenged evidence.
As this court stated in Carlisle v. State, 533 So.2d 645, 647-48 (Ala.Cr.App.), cert. denied (Ala.1987):
"`The distinction between abandonment in the proper[ty] law sense and abandonment in the constitutional sense is critical to a proper analysis of the issue. In the law of property, the question *508 ... is whether the owner has voluntarily, intentionally, and unconditionally relinquished his interest in the property so that another, having acquired possession, may successfully exert his superior interest[.] Brown, Personal Property (3d) § 1.6. In the law of search and seizure, however, the question is whether the defendant has, in discarding the property, relinquished his reasonable expectation of privacy so that its seizure and search is reasonable within the limits of the Fourth Amendment. Cf. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In essence, what is abandoned is not necessarily the defendant's property, but his reasonable expectation of privacy therein.
"`Where the presence of police is lawful and the discard occurs in a public place where the defendant cannot reasonably have any continued expectancy of privacy in the discarded property, the property will be deemed abandoned for purposes of search and seizure. Such is the case here.'
"City of St. Paul v. Vaughn, 306 Minn. 337, 237 N.W.2d 365, 370-71 (1975).
"In Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), the United States Supreme Court held that a warrantless seizure of abandoned property by the police does not violate the Fourth Amendment. See also Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924).
"`When individuals voluntarily abandon property, they forfeit any expectation of privacy in it that they might have had. United States v. Berd, 634 F.2d 979, 987 (5th Cir.1981). Therefore, a warrantless search and seizure of abandoned property is not unreasonable under the Fourth Amendment. [Citations omitted.] The existence of police pursuit or investigation at the time of abandonment does not of itself render the abandonment involuntary. United States v. Colbert, 474 F.2d 174, 176 (5th Cir.1973); see generally, e.g., Berd, 634 F.2d at 987; United States v. Canady, 615 F.2d 694 (5th Cir.), cert. denied, 449 U.S. 862, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980); United States v. Williams, 569 F.2d 823 (5th Cir.1978); [United States v.] D'Avanzo, 443 F.2d 1224 [(2d Cir.), cert. denied, 404 U.S. 850, 92 S.Ct. 86, 30 L.Ed.2d 89 (1971)].
"`The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the object. [Citation omitted.] This determination is to be made by objective standards. United States v. Kendall, 655 F.2d 199, 201 (9th Cir.1981), cert. denied, 455 U.S. 941, 102 S.Ct. 1434, 71 L.Ed.2d 652 (1982). An expectation of privacy is a question of intent, which "may be inferred from words spoken, acts done, and other objective facts."`
"United States v. Jones, 707 F.2d 1169, 1172 (10th Cir.1983), cert. denied, 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983). See also State v. Reed, 284 So.2d 574, 575 (La.1973)."
See also Prock v. State, 471 So.2d 519, 520-21 (Ala.Cr.App.1985) (suspect who fled from his truck abandoned his expectation of privacy).
The appellant, by his own admission, "abandoned" his automobile by parking it in someone else's yard. (R. 841, 849, 1077.) Thus, the search of the vehicle which followed its impoundment was not illegal.

B
As for the appellant's contention that the consent-to-search form signed by his wife was invalid, we are not required to address the merits of this claim, since the ruling of the trial judge was proper on the basis of the appellant's abandonment of his automobile. See Mead v. State, 449 So.2d 1279, 1280 (Ala.Cr.App.1984) (a ruling correct for any reason will not be reversed).

VI

A
The appellant claims that numerous Booth violations occurred during the guilt and sentencing phases of the trial. Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, *509 96 L.Ed.2d 440 (1987). See also South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989).
1. During his opening remarks in the guilt phase of the trial, the district attorney made the following comments:
"As you already know, this is a case of capital murder. As I said earlier, this is as serious as it gets. There's no more serious case. This case, as you know, and if you didn't already you will know shortly, it's been a long time coming. This is an important case, not just to the defendant who's standing trial, but, also, to the community that you live in and to the family of Linda Talbert, who's seated out in the Courtroom. This is their day in Court. It's been a long time coming.
"....
"We think, briefly, that the facts are going to show that back on August 31, 1984, over three years ago, that Linda Talbert was alive and well. She was a mother and wife. She was working at Flowers Store, sometimes it's known as Flowers Bait Store or Flowers Bait Bucket or just Flowers Convenience Store. It's still there today. And she was working to help support herself and her family.
"We think the evidence is also going to show that on that day she disappeared from work, and nobody knew where she was." (R. 498-99, 501.)
During the closing arguments in the guilt phase of the trial, the district attorney argued:
"I do want to review a few things, bring a few things up. August 31, 1984. That's over three years ago now. Linda Long Talbert. There hasn't been one unkind word said about her in this case, not one unkind word. We know that she was a wife, the mother of a young child, daughter, and sister. She was working for her family. She was working at a convenience store that's been identified to you as Flowers Store. And somewhere between 9:10 and 9:40 that morning, Central Time, she disappeared. She disappears initially without a trace. She's kidnapped in broad daylight.
"....
"And [Marion Enfinger] said one thing in answer, I think, to Mr. Williams' question. He said, `Well, if you don't want anything there, Mr. Enfinger, why are you in here.' And he said something that I think all of us feel. That in this State, the victim's family should have some rights. They've got a right to know. They've got a right to have their day in Court, whether it's three months or three years. That's what they're here for. And they've got a right. I think that's significant. The victim's family has got a right to know what happened, to have the jury consider the case.
"....
"Finally, ladies and gentlemen, no one but the defendant has put himself before you today. And he, and only he, and the acts that he committed, has put him in that chair over there today. The family of the victim seated in the Courtroom, they don't come here asking for sympathy. They come here asking for justice. That's all. They don't want any sympathy. They're asking for justice. This defendant has never shown mercy and should not be granted any. There's been no evidence whatsoever of any remorse on the part of this defendant. You have a right to consider that, also. This defendant, represented by his able attorneys, has certainly got a fair trial. It was certainly fairer than Linda Talbert's." (R. 705, 722-23, 730-31.)
The appellant also argued that the prosecutor elicited from certain witnesses information about the victim and her family in violation of Booth. During direct examination, Donnie Lee Talbert testified that he was married to the victim, that they had a son who was 18 months old, and that he worked at J.H. Williams's Tool Manufacturing Company and that she worked at Flowers Bait Store at the time of her abduction and murder.
Furthermore, Donnie Ray Buchanan testified that he was a frequent customer at the store and knew the victim personally, since his mother babysat the victim's child. Billy Flowers, the owner of *510 the store, also testified that the victim was an "excellent" and "good" employee.
We hold that the above-challenged testimony was not in violation of Booth. Since the appellant did not object to the testimony of these three witnesses, we must find "plain error" to warrant reversal. We find no such error, especially since the challenged evidence was relevant to the State's case and was not elicited to prejudice the appellant. See Rutledge v. State, 523 So.2d 1087, 1091-92 (Ala.Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988).
The fact that Linda Talbert was a mother and wife was obvious to the jurors. Her husband testified that, on the morning of August 31, 1984, he took their son by the store to see the victim, as he customarily did before he went to work.
The testimony by Billy Flowers as to the quality of the victim's work was likewise relevant to establish, as the State points out, that she did not simply leave the store on her own accord. Buchanan's comment that his mother babysat for the victim was harmless. The testimony was elicited to show that he knew the victim personally.
As for the district attorney's comments in his opening and closing remarks, we again find no error. Attorneys, in arguing to a jury, are allowed to draw reasonable inferences from the evidence. Brown v. State, 393 So.2d 513, 516 (Ala.Cr.App.1981); Watson v. State, 398 So.2d 320, 328 (Ala. Cr.App.1980), cert. denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981). The large majority of the challenged comments falls in this category.
That portion of the district attorney's closing argument about Marion Enfinger's testimony was just such a proper inference. In fact, the inference was based on testimony elicited by defense counsel on cross-examination of Enfinger:
"Q And is that the reason you're up here in Court testifying the way you are, because you're an honorable American citizen?
"A There were several reasons, if you would like me to give them, as to why I am here today.
"Q Sure.
"A One of them is something a man simply has to do what he has to do to clear his conscience. Another thing, I have a family on the outside that I fear for. I don't want anything to happen to them. Mr. Smith threatened my life.
"Q Well don't you thinkif that's true, don't you think that testifying is going to hurt that situation rather than help it?
"A I don't know what that's going to do.
"Q Okay. Why else are you testifying?
"A I'm testifying because I feel the victim has a right to knowthe victim's family.
"Q Okay. Any other reasons?
"A None that I can think of." (R. 1443-44.)
Thus, any error that might have existed was "invited error." Cf. McGahee v. State, 554 So.2d 454, 463 (Ala.Cr.App.), aff'd, 554 So.2d 473 (Ala.1989).
In the latter portion of the district attorney's closing arguments, he stated that the victim's family was not looking for "sympathy" but was looking for "justice." A similar argument was made by the prosecuting attorney in Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), during closing arguments in the penalty phase of the trial. Judge Bowen, in Kuenzel, quoted from People v. Hovey, 44 Cal.3d 543, 244 Cal. Rptr. 121, 749 P.2d 776, 795, cert. denied, 488 U.S. 871, 109 S.Ct. 188, 102 L.Ed.2d 157 (1988), as follows:
"`We observe that the prosecutor, during her penalty phase arguments, referred to the impact of [the victim's] death upon her parents, a subject arguably inappropriate under the recent decision in Booth v. Maryland, (1987) [482] U.S. [496], 107 S.Ct. 2529, 96 L.Ed.2d 440, barring testimony or statements from a victim's family regarding the impact upon them arising from the victim's death.
"....

*511 "`Unlike Booth, where the jury was given lengthy, detailed statements from family members regarding the actual impact of the victim's death upon their lives, here the prosecutor's remarks were confined to matters already obvious to any juror. Accordingly, the Booth decision is "patently distinguishable." (People v. Miranda, supra, 44 Cal.3d 57, 113, 241 Cal.Rptr. 594, 744 P.2d 1127.) Moreover, these remarks did not focus on the effect on the family but instead simply distinguished defendant's treatment of his victims from the treatment they received from their loving families. Accordingly, assuming Booth would apply at prosecutorial argument of this kind, we conclude that the error was harmless beyond a reasonable doubt.'"
See also Rutledge, 523 So.2d at 1091.
We note that no objection was made to any of the arguments during the guilt phase of the trial. Applying the "plain-error" rule, we find that no substantial rights of the appellant were affected and that the jury in its deliberations was not prejudicially affected. Viewing the comments in the context of the entire case, we find no reversible error. Kuenzel; Lewis v. State, 456 So.2d 413, 416 (Ala.Cr.App.1984). See also Bankhead v. State, [Ms. 6 Div. 370, September 29, 1989] (Ala.Cr.App.1989). Cf. Pierce v. State, 576 So.2d 236 (Ala.Cr.App. 1990).
2. The appellant also claims that reversible error occurred by allowing the victim's husband to sit at the State's counsel table during the trial.
Before trial, the district attorney sought to invoke "the rule" and asked to have Lieutenant Jay Jones excused from "the rule." Defense counsel objected, stating "I think there should be only one party sitting at the table with the [district attorney]." (R. 492.)
Other than this statement, there is no evidence whatever that Donnie Lee Talbert was in the courtroom, except when he testified. Furthermore, assuming defense counsel was referring to Donnie Lee Talbert in his statement, he seemed to acquiesce in his presence at the State's counsel's table.
Moreover, even if Donnie Lee Talbert was at counsel's table throughout the trial, we find no error. Under Alabama law, his presence was permissible as the victim's representative. Ala.Code §§ 15-14-50 through -57 (1975) (Supp.1989). See Kuenzel; Crowe v. State, 485 So.2d 351, 363 (Ala.Cr.App.1984), rev'd on other grounds, 485 So.2d 373 (Ala.1985); Brodka v. State, 53 Ala.App. 125, 298 So.2d 55 (1974); see also Pierce v. State, 576 So.2d 236 (Ala.Cr.App.1990).
3. The appellant also challenges the following comments by the district attorney during the penalty phase of the trial in his closing argument:
"And by looking at those certified copies [of his prior criminal record], ladies and gentlemen, I think you can see, this defendant has led a life of crime and a life of inflicting pain and suffering on many, many people. Not just the family of the victim in this case, but it was one continual course of conduct by this defendant in inflicting pain and suffering on everyone he has touched." (R. 1904-05.)
"Now, ladies and gentlemen, one thing is for sure. Without the death penalty, there is no guarantee that this defendant will not kill and kill again. Remember one thing about this case, ladies and gentlemen, that you've just heard. The case took place back on August 31, 1984. I think this is important. You heard the testimony of Mrs. [J.F.] as to what happened to her in Columbus that day, the kidnapping and the subsequent strangulation murder. And then what else have you heard? In December of 1984, the defendant was still at it. [You] heard about the situation over in Auburn involving the Auburn coed. He's still at it. You heard about the high speed chase with shots fired. And, ladies and gentlemen, this defendant is going to be still at it as long as he's on the face of this earth." (R. 1907-08.)
*512 The appellant argues that the district attorney's reference to the victim's family and to guilt-phase evidence violates Booth.
The present comments are distinguishable from those in Booth, "where the jury was given lengthy detailed statements from family members regarding the actual impact of the victim's death upon their lives...." People v. Hovey, 244 Cal.Rptr. at 141, 749 P.2d at 795, quoted in Kuenzel. The casual comments to the effects of the crime on the victim's family were not error. See Rutledge, 523 So.2d at 1091. Cf. McGahee, supra.
The district attorney's rehashing of the guilt-phase evidence was simply part of his argument about the aggravating circumstances in this case. Section 13A-5-47(c), Code of Alabama 1975, states:
"Before imposing sentence the trial court shall permit the parties to present arguments concerning the existence of aggravating and mitigating circumstances and the proper sentence to be imposed in the case."
Furthermore, § 13A-5-45, Code of Alabama 1975, states:
"(c) At the sentence hearing evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to the aggravating and mitigating circumstances referred to in sections 13A-5-49, 13A-5-51 and 13A-5-52. Evidence presented at the trial of the case may be considered insofar as it is relevant to the aggravating and mitigating circumstances without the necessity of reintroducing that evidence at the sentence hearing, unless the sentence hearing is conducted before a jury other than the one before which the defendant was tried.
"....
"(e) At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstances which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing."
The district attorney's comments were within the permissible scope and leeway allowed attorneys in arguing to the petit jury.
"The arguments were directed to a relevant sentencing concern of the jury, they were not delivered in an excessive and intolerable manner, and they did not divert the jury's attention from its proper function. Brooks v. Kemp, [762 F.2d 1383 (11th Cir.1985), cert. denied, 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986) ]."
Rutledge, 523 So.2d at 1101. The challenged comments were an attempt by the district attorney to prove, as he is required by statute to do, those aggravating circumstances listed in section 13A-5-49, Code of Alabama 1975. These statutory sections and the arguments advanced by the district attorney do not contravene the mandates of Booth.
4. The trial judge, in his instructions to the penalty phase jury, stated:
"In making your recommendation concerning what the punishment should be, you must determine whether any aggravating circumstances exist. And if so, you must determine whether any mitigating circumstances ... exist. In making your determination concerning the existence of aggravating and mitigating circumstances, you should consider the evidence presented at this hearing. You should also consider any evidence that was presented during the guilt phase of the trial, that is, the rest of the trial, that is relevant to the existence of any aggravating or mitigating circumstances." (R. 1916.) (Emphasis added.)
The appellant argues that the trial judge committed reversible error by extending an invitation to the jury during the penalty phase of the trial to consider guilt-phase evidence.
The same jury that returned a verdict against the appellant also sat through the penalty-phase evidence, argument, and instructions, *513 and returned a recommendation of death. It would be unrealistic for us to suppose that jurors, such as these, could sit through a lengthy trial, return a verdict, and then immediately go into a sentencing hearing and magically forget all they heard during the guilt-phase of the trial. Therefore, it seems to us that the trial judge's instructions benefited the appellant, since the trial judge asked them to consider only that evidence from the guilt phase of the trial which applied to aggravating and mitigating circumstances. This becomes especially so, when, as here, the trial judge fully explains the purpose of mitigating and aggravating circumstances, explains the weighing process, and lists the applicable circumstances as included in §§ 13A-5-49 and -51, Code of Alabama 1975 (Supp. 1989).
We, thus, hold that the trial judge's instructions complied with § 13A-5-46(d), Code of Alabama 1975, and were not violative of Booth.
5. The pre-sentence investigation report prepared in this case and presented to the trial judge contained the following "victim impact" statement:
"According to the Victim's Impact Report returned by Mr. Donnie Talbert, he states that he does not know how to put it in words the shock, grievement, and problems that this crime has induced on himself and his family. He went on to say he does not understand how anyone is to expect a person that has lost someone by a crime of this nature to put in monetary loss but all___ed values that come with the heartache of this crime. There was monetary loss but all the money, time, and grief, could not in any way compensate for the loss of someone's life. He went on to say that he would like to see anyone try to fill out a form of this type. It is like trying to compare a life with an automobileit stinks.

"Donnie Talbert went on to say how do you describe losing a wife and a 14-month-old child's mother in changing your life.
"According to Donnie Talbert, he states that he suffered monetary losses in the amount of $5,373.00. (See Victim's Impact Report attached)"
The appellant argues that this statement improperly influenced the trial judge to accept the jury's recommendation and impose the death sentence on the appellant.
Our Supreme Court, in Ex parte Martin, 548 So.2d 496 (Ala.1989), considered this issue. In Martin, the victim impact statement that was at issue was very similar to the one in the present cause. Justice Almon, writing for the court, opined:
"In Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Court held that the introduction at the sentencing phase of a capital murder trial in the state court of a victim impact statement, describing the effect of the crime on the victim's family, violates the Eighth Amendment. This case, however, differs from Booth.

"In Booth, the victim impact statement was submitted to the jury for its consideration. In the present case, the presentence report was not presented to the jury, but was presented to the court. We also note that the victim impact information comprises only three sentences in a 36-page report that contains, among other things, details of the offense, mitigating and aggravating circumstances, Martin's criminal record, and Martin's personal history. We hold that the introduction of the presentence report containing the above statement was not error."
Martin, 548 So.2d at 497-98.
Likewise, in Kuenzel, Judge Bowen pointed out that the victim impact statement in that case was "relatively innocuous." He noted that there was no evidence that the trial judge considered the "victim impact" statement and concluded that no Booth violation occurred under those facts.
More recently, however, in Pierce v. State, 576 So.2d 236 (Ala.Cr.App.1990), we chose to remand that case for resentencing with express instructions to the trial judge not to consider the "victim impact" statement. In Pierce, as opposed to Martin or Kuenzel, or the cause sub judice, the victim *514 impact statement was very detailed, covered five pages of the presentence investigation report, included a recommendation by the preparer of the document (quoting from the Bible), and closely paralleled that situation in Booth. We thus chose, "in an abundance of caution," to remand the cause for further consideration and sentence by the trial judge.
We are of the opinion that the same is not required in the present cause. The victim impact statement included in the presentence investigation in this cause was no more harmful than the one in Martin. The appellant is thus not due to prevail on this issue.

B
The appellant next contends that Alabama's death penalty statute is unconstitutional, as written, and also as applied to him in this case. Specifically, the appellant argues "[t]he requirement that a sentencer impose death unless it is shown that the mitigating circumstances outweigh aggravating circumstances prevents any reasoned moral response to a defendant and his or her crime." (Appellant's brief at 9.)
1. We do not find the appellant's argument persuasive. Section 13A-5-46(e)(3) states:
"If the jury determines that one or more aggravating circumstances as defined in section 13A-5-49 exist and that they outweigh the mitigating circumstances, if any, it shall return an advisory verdict to the trial court that the penalty be death." (Emphasis added.)
The "shall return" language in no sense requires jurors to set aside their own common sense, compassion, and morals. They are still free to make individual assessments. As was stated in Boyde v. California, 494 U.S. 370, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990):
"Petitioner suggests that the jury must have freedom to decline to impose the death penalty even if the jury decides that the aggravating circumstances `outweigh' the mitigating circumstances. But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence `in an effort to achieve a more rational and equitable administration of the death penalty.'"
See Kuenzel, citing Boyde and Blystone v. Pennsylvania, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990) (holding constitutional a Pennsylvania statute which requires a sentence of death if aggravating circumstances outweigh mitigating circumstances).
This appellant claims, however, that the jury instructions regarding the balancing of aggravating and mitigating circumstances were "identical" to those in Jackson v. Dugger, 837 F.2d 1469 (11th Cir.), cert. denied, 486 U.S. 1026, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988).
This same argument was advanced in Pierce v. State, 576 So.2d 236 (Ala.Cr.App. 1990), and struck down as being incorrect and meritless. The present cause, in this regard, is indistinguishable from Pierce. Jackson v. Dugger is not controlling under the facts and circumstances of this case.
2. At the close of the penalty phase of the trial, the judge instructed the jury as follows:
"The aggravating circumstances which you may consider in this case, if you find from the evidence that they have been proved beyond a reasonable doubt, [are] as follows: One, the defendant was previously convicted of a felony involving the use or threat of violence to the person. Second, the capital offense was committed while the defendant was engaged in the commission of or an attempt to commit kidnapping." (R. 1917.)
The appellant claims that the trial judge mistakenly instructed the jury that they could find, as an aggravating circumstance, that the appellant had previously been convicted of "a felony involving the use or threat of violence to the person." Ala. Code § 13A-5-49(2) (1975) (Supp.1989). (See appellant's brief at 12, n. 3.)
Assuming this to be true, any error would be harmless. Rule 45, A.R.A.P. *515 The jury needs to find only one aggravating circumstance to outweigh any mitigating circumstance to validate its recommendation of death. Ala.Code § 13A-5-46 (1975). As the trial judge noted in his sentencing order (R. 2053), no mitigating circumstances were presented to imply the proper sentence should have been life imprisonment without parole. We agree with this finding.
On the other hand, the State presented overwhelming evidence that the appellant deliberately murdered Linda Talbert during the process of kidnapping her. While this is all that was needed to support the sentence of death, the State presented evidence during the guilt phase and reiterated that evidence during the penalty phase of the trial that the appellant used a weapon during the commission of the burglary in Auburn (the crime which led to his arrest). The jury was also presented with a certified copy of a 1964 robbery conviction of this appellant, which indicated the robbery was committed with the use of a dangerous weapon.
Moreover, this issue was not raised at the trial level. Based on our above findings, we do not find any real basis for a belief that the instruction caused "an unfair prejudicial impact on the jury's deliberation." Thus, we find no "plain error."

C
The appellant further claims that the district attorney made comments during the guilt phase and penalty phase of the trial which were so prejudicial that he was denied a fair trial and sentencing hearing.
During his closing remarks in the guilt phase of the trial, the district attorney commented as follows:
"Now, ladies and gentlemen, if this defendant ever gets loose again, he's going to do it again. He's going to kill, and he is going to kill again. And I would ask you to consider that." (R. 1727) (Emphasis added.)
Later, in his closing remarks during the penalty phase, the district attorney commented as follows:
"Alabama law, ladies and gentlemen, provides the maximum punishment only for the maximum crime. That's what we have here. We have a murder committed during the course of another felony, that is kidnapping. And Alabama law provides maximum punishment in only for the worse defendants. That's why we have aggravating and mitigating circumstances. And that's what we have here, one of the worse defendants ever to come into Lee County, Alabama, in the history of the State.
"When both factors exists, ladies and gentlemen, a horrible crime and a horrible defendant, as it does here, then the State thinks it becomes your duty, your sworn duty as a juror, to follow the law as given you by the Court, that is, Judge Gullage, and recommend to the Court that the death penalty be imposed in this particular case. And it is appropriate that the death penalty is available in this State and in this County. The death penalty, ladies and gentlemen, is nothing new. It came over on the boat, as they say. It came over with the Pilgrims. And it has been a part of this Country's history from the very beginning. It is well recognized throughout the history of this land and the State as a legal and moral right to take a life, whether in time of war by soldiers or whether in the Court of law after someone has had a very fair trial.
"Ladies and gentlemen, the death penalty is the only way guaranteed that this defendant will never harm anyone else, either inside or outside of prison. It is the only way to guarantee it. The defendant may escape from prison. But the defendant cannot escape from a death penalty once it is imposed and carried out.
"....
"Now, ladies and gentlemen, one thing is for sure. Without the death penalty, there is no guarantee that this defendant will not kill and kill again. Remember one thing about this case, ladies and gentlemen, that you've just heard. The case took place back on August 31, 1984. I think this is important. You *516 heard the testimony of Mrs. [J.F.] as to what happened to her in Columbus that day. And you heard the testimony about the Linda Talbert case, the kidnapping and the subsequent strangulation murder. And then what else have you heard? In December of 1984, the defendant was still at it. [You] heard about the situation over in Auburn involving the Auburn coed. He's still at it. You heard about the situation over in Auburn about the high speed chase with shots fired. And, ladies and gentlemen, this defendant is going to be still at it as long as he's on the face of this earth. He's still at it then and he's still at it here, if he gets another chance. Unless the defendant in this case receives the death penalty, can anyone guarantee that it won't happen again and another human life be lost? But whose wife or daughter will it be the next time if the defendant ever gets loose? Either this defendant is removed from society, ladies and gentlemen, forever and guaranteed, or we become prisoners ourselves, afraid to send our own wives or daughters to the store in broad daylight.

"The defendant, in his life of crime, has put him in the position that he's in today. No one else has. And only you can stop this defendant and his continued life of crime." (R. 1905-08.) (Emphasis added.)
The appellant argues that the abovequoted italicized comments constituted improper prosecutorial argument. We note initially that the appellant did not voice an objection to these comments at trial.
As we stated in Bankhead v. State, [Ms. 6 Div. 370, September 29, 1989] (Ala.Cr. App.1989):
"Our examination of the record reveals that there were no objections made at trial to the matters of which appellant now complains. Thus, this issue was not preserved at trial. However, appellant's failure to preserve this issue, `while weighing against defendant as to any possible claim of prejudice, serves as no impediment to our scope of review pursuant to the "plain error" mandate in death penalty cases.' Ex parte Bush, 431 So.2d 563, 565 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). Therefore, we must now consider whether the prosecutor's remarks constituted `plain error.' Our Supreme Court has adopted federal case law defining plain error, holding that `[p]lain error only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.' Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). It is only where a particularly egregious error occurs at trial that the plain error standard is applied. Ex parte Harrell, 470 So.2d 1309, 1313 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). We have applied this standard to prosecutorial argument. Murry v. State, [562] So.2d [1348] (Ala.Cr.App.1988)."
See also Pierce; Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
1. The appellant argues that the district attorney's claim that the appellant would kill again if not sentenced to death violated Whisenhant v. State, 482 So.2d 1225 (Ala.Cr.App.1982), aff'd in part, 482 So.2d 1241 (Ala.), on remand, 482 So.2d 1246 (Ala.Cr.App.1983), rev'd and remanded, 482 So.2d 1247 (Ala.), on remand, 482 So.2d 1249 (Ala.Cr.App.1984).
In Whisenhant, we stated:
"`It has been specifically held that remarks by the prosecutor which accuse the defendant of a commission of a crime other than that for which he is on trial and which are unsupported by any evidence in the case, require reversal. Bevins v. State, 39 Ala.App. 228, 229, 97 So.2d 572, cert. denied, 266 Ala. 695, 97 So.2d 574 (1957).'"
Whisenhant, 482 So.2d at 1239 (quoting Moreland v. State, 373 So.2d 1259, 1262-63 (Ala.Cr.App.1979)).
The appellant claims that the district attorney's arguments implied that he would *517 commit unproven future crimes. We disagree.
In Holladay v. State, 549 So.2d 122 (Ala. Cr.App.1988), aff'd, 549 So.2d 135 (Ala. 1989), cert. denied, ___ U.S. ___, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989), we held that the prosecutor's comparison of the defendant to "Ole Yellow" was not reversible error. We stated that this comparison was designed to illustrate the potential future dangerousness of this appellant. In so holding, we opined:
"The argument pointed out the fact that, although no one wishes to take the life of another person, it sometimes is necessary when the person poses a threat to society. We believe this argument was proper. See Davis v. Kemp, 829 F.2d 1522 (11th Cir.1987), cert. denied, 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988)."
A similar argument was also made by the prosecutor in Rutledge v. State, 523 So.2d 1087, 1099-1100 (Ala.Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988). In Rutledge, we held that such argument properly encourages the jury to impose the death penalty to "deter" future crimes. See Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Brooks v. Kemp, 762 F.2d 1383 (11th Cir. 1985), vacated, 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986).
The fact that the appellant could potentially murder someone in the future was a proper argument by the district attorney. The evidence at trial supported the fact that the appellant had a long and storied history of crime, some of which involved violent behavior. More specifically, between August and December 1984, the appellant became extremely violent. Other than killing Linda Talbert, the evidence at trial showed that the appellant attempted to rape a woman in Columbus, Georgia, and then broke into a woman's apartment in Auburn and fired a shot from his pistol.
The argument by the district attorney was not error.
2. The appellant also argues that the district attorney's comments regarding potential future threats of harm violate the mandates of Berard v. State, 486 So.2d 476, 478-79 (Ala.1985). We disagree.
In Berard, the prosecutor cross-examined the defendant's psychiatrist during the guilt phase of the trial. The prosecutor asked the psychiatrist if the defendant could lapse into a psychotic spell in the future and kill again. The witness answered in the affirmative.
In reversing Berard's conviction, the Supreme Court stated:
"It would seem to be much more prejudicial to a defendant to allow the prosecutor to elicit this kind of testimony from a defense witness than it would be for the prosecutor to merely comment on that possibility in closing argument."
Berard, 486 So.2d at 479.
The Supreme Court in Berard seemed to rely on State v. Barksdale, 590 S.W.2d 931, 933 (Tenn.1979), which reversed a conviction on facts similar to those in Berard. The Alabama Supreme Court further pointed out that Barksdale was based on Covey v. State, 504 S.W.2d 387, 393 (Tenn.Cr.App. 1973). In Covey, the prosecutor stated during his closing arguments that "the defendant could `go right out there and kill again.'"
The Court in Berard concluded that the testimony elicited from the psychiatrist in that case could have shifted the jury's focus from guilt to punishment. This, the Court opined, became increasingly important because in a capital murder case the State is required to prove the appellant's guilt beyond a reasonable doubt in the guilt phase of the trial.
While the district attorney's comment during the guilt phase that the appellant could kill again skates on the edge of error, in light of Berard, we do not believe he crossed the threshold to reversal. The State overwhelmingly, in our opinion, proved the appellant's guilt. There is no evidence whatever that this comment was so egregious as to seriously affect the "substantial rights" of this appellant nor is there any evidence that the comment had an "unfair prejudicial impact" on the jury's verdict. Hooks, 534 So.2d at 351-52, quoting *518 Young, 470 U.S. at 16, 105 S.Ct. at 1047.
Moreover, the two-part function of the jury was explained by the trial court and by the attorneys on numerous occasions. In fact, the district attorney, at the start of his closing argument during the guilt phase of the trial stated:
"As I said earlier, also, in my opening statement, this is a two part trial. And we're in that phase of the trial known as the guilt or innocent phase.
"At this particular portion, your duty will be to determine the guilt or innocence of the defendant. Should you find the defendant not guilty or find the [defendant] guilty of the lesser included crimes of this charge, that is what we call ordinary murder or kidnapping, then your duty will be concluded.
"On the other hand, ladies and gentlemen, should you find this defendant guilty of capital murder, which we are asking you to do, then we would go immediately today, immediately, into the punishment phase of the trial. And at that phase of the trial, it would be your duty to decide upon the appropriate punishment in this case. There are two choices: death by electrocution and life without parole. That would be your two choices." (R. 1704-05.)
The trial judge in his oral charge, in like fashion, instructed the guilt-phase jury of the task at hand.
"Now the defendant, James Wyman Smith, is charged by an Indictment returned by [the] Grand Jury of this County with having committed a capital offense. A capital offense is an offense for which the punishment is either life imprisonment, without parole, or death. The law provides that if a defendant is convicted of a capital offense, additional proceedings will be necessary to determine whether the defendant's punishment is to be life imprisonment, without parole, or death. So you're not to concern yourself at this time with any issue of punishment. Instead, the only determination you are to make at this time is whether the State has proved, beyond a reasonable doubt, that the defendant is guilty of an offense charged by the Indictment." (R. 1854.)
We thus hold that the jury's functions in both phases of the bifurcated trial were made clear to them. The challenged comments, though improper in the guilt phase of the trial, do not warrant reversal of the appellant's conviction, since there is little possibility that they improperly affected the jury in its deliberation.
The appellant is thus not due to prevail on this issue.
3. The appellant also argues that the district attorney's comment, "whose wife or daughter will it be next time," constituted reversible error. He claims that the comment implied to the jury that the appellant was known to commit sexual crimes against women.
The challenged comment was not error. It was a proper inference based on the evidence, especially since the last three crimes (as described above) that were committed by this appellant involved women.
As we stated in Bankhead:
"While it is true that `[a]ttorneys should be careful in their arguments to the jury to refrain from an injection of their own experience [or] knowledge in support of their argument,' this is to be `distinguished from what they deemed to be reasonable inferences to be drawn from the evidence.' Brown v. State, 393 So.2d 513, 516 (Ala.Cr.App.1981). `It is well established that no legal standard exists to judge the prejudicial qualities of alleged improper comments by either party. Such must be scrutinized in light of the issues, parties, and general circumstances of the particular case.' Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr. App.1980), cert. denied, 404 So.2d 100 (Ala.1981), and cases cited therein. `In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses "[o]ur task is to consider their impact in the context of this particular trial," and "not view the group of allegedly improper questions and comments in the abstract." United States v. *519 Davis, 546 F.2d 583, 593 (5th Cir.1977).' Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983).
"`The prosecutor's statements are not evidence. Henry v. State, 468 So.2d 896, 899 (Ala.Cr.App.1984), cert. denied, 468 So.2d 902 (Ala.1985). Further, prosecutors are to be allowed a wide latitude in their exhortations to the jury. Varner v. State, 418 So.2d 961 (Ala.Cr.App.1982). "Statements of counsel and argument must be viewed as in the heat of debate and must be valued at their true worth rather than as factors in the formation of the verdict." Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984).'"

"Armstrong v. State, 516 So.2d 806, 809 (Ala.Cr.App.1986). Furthermore, `[t]he trial judge can best determine when discussion by counsel is legitimate and when it degenerates into abuse. Garrett v. State, 268 Ala. 299, 105 So.2d 541 (1958); Hurst v. State, 397 So.2d 203 (Ala.Crim.App.), cert. denied, 397 So.2d 208 (Ala.1981).' Henderson v. State, 460 So.2d 331, 333 (Ala.Cr.App.1984)."
And as we stated in Kuenzel, quoting Roberts v. State, 346 So.2d 473, 476-77 (Ala.Cr. App.), cert. denied, 346 So.2d 478 (Ala. 1977): "Trial judges ordinarily are loath to limit inferential argument which has any connection with the evidence even though farfetched.... So long as counsel does not travel out of [the evidence in] his case and confines statements to reasonable inferences deducible from the evidence, he should not be controlled."
In the present case, the district attorney's comments fell within these limitations. We, thus, find no error in these comments.
4. The appellant also claims that the district attorney's statement that the appellant was "one of the worse defendants ever to come into Lee County, Alabama, in the history of the State" constituted reversible error. Likewise, he argues that the district attorney's historical reference to the death penalty (i.e., "[i]t came over on the boat") was error.
He claims that both comments were interjections of the district attorney's own experience and were unsupported by the evidence.
These remarks were simply comments in the heat of debate. They do not constitute "plain error." Henderson; Bankhead; Pierce.

D
The appellant next contends that the district attorney in his arguments to the jury and the trial judge in his oral charge committed reversible error by explaining to the jury that their sentence was a recommendation only, in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).
This argument was put to rest in Martin v. State, 548 So.2d at 494.
"Under Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), `it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.' However, the comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentencing verdict was `advisory' and a `recommendation' and that the trial court would make the final decision as to sentence does not violate Caldwell. `[C]omments which accurately explain the respective functions of the Judge and jury are permissible under Caldwell "as long as the significance of [the jury's] recommendation is adequately stressed."` Harich v. Wainwright, 813 F.2d 1082, 1101 (11th Cir.1987). Here, neither the prosecutor nor the trial court misrepresented the effect of the jury's sentencing recommendation. The cases of Caldwell, supra; Mann v. Dugger, 817 F.2d 1471 (11th Cir.), vacated, 828 F.2d 1498 (1987); Adams v. Wainwright, 804 F.2d 1526 (11th Cir.1986), modified, Adams v. Dugger, 816 F.2d 1493 (11th Cir.1987); and Harich, supra, each involved *520 a situation where the prosecutor and the trial court misled the jury as to its critical role in sentencing under state law. In Hooks v. State, 534 So.2d 329 (Ala.Cr.App.1987), this Court reviewed the decisions of other jurisdictions which have confronted this issue and concluded: `The trial judge's and the prosecutor's remarks clearly defined the jury's role in the sentencing scheme. Thus, the jury could not have been confused as to its responsibility in the sentencing process. The remarks made here were a correct statement of the law and did not tend to mislead or misinform the jury. Therefore, we conclude the remarks were not improper under Caldwell, supra.'"
The present cause is indistinguishable from Martin. The challenged comments were not contrary to Caldwell v. Mississippi. See also Kuenzel, 577 So.2d at 501.

E
The appellant challenges as erroneous the following oral charge to the jury during the guilt phase of the trial.
"I told you earlier that the Indictment charges, in addition to the capital offense, two lesser included offenses, which are not capital offenses. By saying that these lesser included offenses are not capital offenses, I mean that the punishment for these lesser included offenses is something other than life imprisonment without parole or death. If you are convinced beyond a reasonable doubt that the defendant is guilty of the capital offense charged, then you would not consider the lesser included offenses. However, if you are not convinced beyond a reasonable doubt that the defendant is guilty of the capital offense charged, then you would consider the lesser included offenses." (R. 1861.) (Emphasis added.)
The appellant argues that the trial court's instruction improperly led the jury to believe that it had to consider the greater offense of capital murder before considering the lesser offenses of murder and kidnapping in the first degree.
No objection was raised regarding this charge at the trial level. Thus, to reverse on this issue, we must find "plain error." See Ex parte Harrell, 470 So.2d 1309, 1312 (Ala.1984), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
We will not determine that a trial court is in error when it instructed the jury according to the law that this court and the Alabama Supreme Court have deemed to be correct. This holds true especially where no objection to the jury charge was made at the trial level. Harrell, 470 So.2d at 1315.
In Bragg v. State, 453 So.2d 756, 759 (Ala.Cr.App.), cert. denied (Ala.1984), we wrote:
"When a greater and a lesser included offense are charged, the proper course is for the trial judge to instruct the jury to consider the lesser offense only if a reasonable doubt exists concerning the accused's guilt of the greater offense. Fuller v. United States, 407 F.2d 1199, 1227 (D.C.Cir.1967), cert. denied, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969) (emphasis added)."
See also Lindsey v. State, 456 So.2d 383, 387 (Ala.Cr.App.1983), aff'd, 456 So.2d 393 (Ala.1984), cert. denied, 470 U.S. 1023, 105 S.Ct. 1384, 84 L.Ed.2d 403 (1985).
Thus, we find no "plain error" in the trial court's oral charge to the jury.

F
Over the appellant's objection at trial, J.F. testified that, on the morning of August 31, 1984 (the same day that Linda Talbert was abducted and murder), the appellant came into her office in Columbus, Georgia, and, at gunpoint, attempted to rape her. She also stated that the appellant made her perform oral sex on him. She testified that, during this time, he laid the gun down. She claimed that she grabbed the gun, pointed it at him, and pulled the trigger, but nothing happened. According to J.F., the appellant then took the gun, placed it to her head, and pulled the trigger twice, but again the gun did not fire.
*521 J.F. testified that the appellant then made her perform oral sex on him again. After a short time, he locked her in the bathroom and left.
Finally, J.F. stated that the appellant had been indicted in Columbus, Georgia, for the alleged crime, but he had not been tried and convicted as of the time of the trial at bar.
The appellant argues that this testimony was irrelevant to his present charge and was admitted in violation of his constitutional rights. We disagree. The challenged testimony was admissible under two exceptionsres gestae (or one continuous transaction) and motive (or state of mind) to the general exclusionary rule of other criminal conduct.
The general rule and the two above-noted exceptions were discussed, at length, by this Court in Twilley v. State, 472 So.2d 1130, 1133-37 (Ala.Cr.App.), cert. denied (Ala.1985).
"While the general rule is that evidence of separate crimes is inadmissible where the only probative function of such evidence is to show bad character, or an inclination or propensity to commit the type of crime for which accused is being tried, Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953), if the accused's commission of another crime or misdeed is an element of guilt, or otherwise tends to prove his guilt, then proof of such other crimes or misdeeds is admissible. Cheatham v. State, 431 So.2d 1350 (Ala.Crim. App.1983); Watson v. State, 398 So.2d 320 (Ala.Crim.App.1980), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981); Sparks v. State, 376 So.2d 834 (Ala.Crim.App.1979); C. Gamble, McElroy's Alabama Evidence, § 69.01(1) (3d ed. 1977)."
Twilley, 472 So.2d at 1134. See also Coleman v. State, 487 So.2d 1380, 1384 (Ala.Cr. App.), cert. denied (Ala.1986) (evidence of robbery on same date and within 15 miles of second robbery held admissible as evidence of "one continuous transaction"); Lucy v. State, 340 So.2d 840, 844 (Ala.Cr. App.), cert. denied, 340 So.2d 847 (Ala. 1976) (evidence that accused shot another person shortly after first shooting held admissible).
Furthermore, this Court stated in Holsemback v. State, 443 So.2d 1371, 1380 (Ala.Cr.App.1983), cert. denied (Ala.1984), as follows:
"The general rule is that `[i]n a homicide prosecution, "threats or hostile demonstrations by the accused toward persons not connected with the deceased are not admissible." McGuff v. State, 49 Ala.App. 88, 91, 268 So.2d 868, 871, cert. denied, 289 Ala. 746, 268 So.2d 877 (1972).' Voudrie v. State, 387 So.2d 248, 252 (Ala.Cr.App.), cert. denied, 387 So.2d 256 (Ala.1980); Wiggs v. State, 24 Ala. App. 22, 129 So. 706 (1930); C. Gamble, McElroy's Alabama Evidence, Section 44.01(1). In a prosecution for murder, `it is not permissible to show a difficulty between the accused and a third person not connected with the victim or the offense.' Caylor v. State, 353 So.2d 8, 10 (Ala.Cr.App.1977), cert. quashed, 353 So.2d 11 (Ala.1978). `The state is not allowed to supply the intent to kill one victim by showing that the defendant had assaulted a third party on another unrelated occasion.' Caylor, 353 So.2d at 10."
In discussing the general rule and the two exceptionsres gestae and motivein Twilley, this Court quoted from McElroy at § 70.01(12) as follows:
"`(a) General exclusionary rule applicable in homicide.
"`The general rule which excludes evidence of prior and subsequent crimes, when their only probative value is to show in the defendant a tendency or disposition to commit the now-charged crime, is applicable when the accused is being prosecuted for homicide. If the evidence of other criminal acts does not fall within one of the exceptions to this general exclusionary rule then it is not to be admitted.
"`(b) Res gestae; one continuous transaction; inseparable crime.
"`The prosecution may prove the accused's commission of another crime if the evidence warrants a reasonable inference *522 that such other crime was a part of the same transaction as the now-charged homicide. This rule is based upon the reasoning that the other crime was part of the res gestae or, with the nowcharged crime, forms a part of one continuing transaction....
"....
"`(e) Motive.
"`Another of the primary exceptions to the general rule excluding evidence of other crimes is the principle that other crimes are admissible if they have probative value upon the issue of motive for the now-charged crime. The motive element of a homicide may take many forms. For example, it may involve malice, ill-will for the victim or it may include the purpose of the homicide.... Whenever a prior or subsequent crime is relevant to prove the motive for the nowcharged homicide, it is admissible.
"`The most frequent application of the above rule is in murder prosecutions where malice or ill-will toward the victim is a requisite motive for the crime....
"`The mental state of the accused at the time of the charged homicide may itself be considered as motive. Under that view, evidence of accused's commission of another crime of violence against a stranger to the victim, very close in time and place to the charged homicide, is admissible as tending to show that the defendant, at the time of the charged homicide, was in a reckless, dangerous, or malicious mood. It should be noted that this ground for admission of other crimes will have its primary force when the court will not admit the other crimes as part of the res gestae of the now-charged homicide. [Emphasis added.]'"
Twilley, 472 So.2d at 1134. We stated in like fashion in Holsemback, 443 So.2d at 1380, quoting at length from Sims v. State, 253 Ala. 666, 46 So.2d 564, 566 (1950), and Keith v. State, 253 Ala. 670, 675, 46 So.2d 705 (1950).
Along these same lines in Twilley, we further opined:
"The rule has been stated many times by the appellate courts of this State that in a prosecution for homicide, evidence of connected acts and transactions leading up to and explanatory of the killing is admissible. Byrd v. State, 257 Ala. 100, 57 So.2d 388 (1952); Keith v. State, 253 Ala. 670, 46 So.2d 705 (1950); Levert v. State, 252 Ala. 308, 42 So.2d 532 (1949); Stallings v. State, 249 Ala. 580, 32 So.2d 236 (1947); McCoy v. State, 232 Ala. 104, 166 So. 769 (1936); Jordan v. State, 81 Ala. 20, 1 So. 577 (1886); Golden v. State, 39 Ala.App. 361, 103 So.2d 52, reversed on other grounds, 267 Ala. 456, 103 So.2d 62 (1958); Sexton v. State, 28 Ala.App. 59, 180 So. 729 (1937); Newman v. State, 25 Ala.App. 526, 149 So. 724 (1933); Roberts v. State, 25 Ala.App. 477, 149 So. 356 (1933).
"For example, in Byrd v. State, supra, the Supreme Court of Alabama stated:
"`It is true, however, that where there is an unbroken chain of events beginning with a prior difficulty and leading up to the killing, the chain of events leading up to the killing need not be a part of the res gestae in the sense that these events become a part of the crime itself, but they are admissible since they lead up to and tend to explain the acts, animus or intent of the defendant at the time he committed the killing.'
"In Newman v. State, supra, the Alabama Court of Appeals stated:
"`In a prosecution for homicide, evidence of connected acts and transactions leading up to and explanatory of the killing is admissible. These acts and circumstances need not necessarily be a part of the res gestae, in a sense that they become a part of the crime itself, but they are admissible where they throw any light upon the acts, animus, or intent of the defendant, and in this case the mental attitude of the defendant at the time of the fatal difficulty as bearing on the question of freedom from fault....' (Emphasis added.)"
Twilley, 472 So.2d at 1135.
Upon finding that the evidence does fall within at least one of the exceptions to the *523 general rule of exclusion, we must then weigh the potential prejudice to this appellant caused by the admission of the challenged evidence.
"`"Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government's case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects."' Averette v. State, 469 So.2d 1371, 1374 (Ala.Cr.App.1985), quoting United States v. Turquitt, supra [557 F.2d 464] at 468-69 [(5th Cir. 1977)]. `"`Prejudicial' is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial." [Citations omitted.] "Of course, `prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.'"' Averette v. State, supra, at 1374."
Robinson v. State, 528 So.2d 343, 347 (Ala. Cr.App.1986), cert. denied (Ala.1988) (evidence of alleged "staged" burglary held admissible in murder trial). See also Smith v. State, 447 So.2d 1327, 1329 (Ala. Cr.App.1983), aff'd, 447 So.2d 1334 (Ala. 1984) (evidence of illegal drinking and gambling in "shothouse" where victim was killed held properly admissible, since the entire facts leading up to the victim's death "were so inextricably intertwined therewith as to be part of the res gestae").
J.F. testified that, during the time the appellant attempted to rape and sodomize her, he was "impotent." (R. 1473.) The State used this fact to tie-in the attack against her with the abduction and murder of Linda Talbert. This theory was summed up by the district attorney in his closing remarks to the guilt-phase jury:
"But there's something else that she said, and I think it kind of ties everything together. She said that during this whole attack and after the sodomy, that the defendant attempted to rape her. But he was impotent. He couldn't do it. And it made him mad. And let's think about that. This whole horrible attack of [J.F.], the defendant is impotent. So what does he do? He heads on back to Lee County, Alabama, he goes to the Flowers Store and he sees another young girl, one that he knew worked in there and worked in there alone, and it's broad daylight. But here is a man obsessed and here is a man frustrated. And he says I'll succeed this time. And he abducts Linda Talbert. And he takes her out into the wooded area. And what did he tell Marion Enfinger? He attempted to rape her, but he couldn't. He didn't get it done. And again, he's obsessed. He's frustrated. And he takes his frustration out on Linda Talbert by killing her." (R. 1726-27.)
This argument was proper in view of the testimony of J.F. and Marion Enfinger. Enfinger testified that on one occasion he asked the appellant why he killed Linda Talbert. According to Enfinger, the appellant responded, "Sometimes I can get in an argument with my wife or somebody and then things just go to my head and I get the urge to do these things." (R. 1328.)[3] Furthermore, Enfinger claimed that the appellant told him that he was involved in an incident in Columbus, Georgia, with a detective's wife.[4]
*524 Based on this evidence, the testimony of J.F. regarding the attempted rape and sodomy on her person was proper. The evidence tended to show that the appellant, after failing to consummate the rape in Columbus, Georgia, proceeded to Smiths Station, Alabama, (not far away), where he stopped at Flowers Bait Store and, upon an indiscriminate urge, abducted Linda Talbert.
Furthermore, the evidence at trial indicated sexual overtones involved in her murder. Her nude body was found in a decomposed state, and her brassiere and panty hose were found wrapped around her neck. Enfinger also testified that the appellant told him that "he tried to have intercourse with her," but that she "struggled," and, consequently, that he "choked" or "strangled" her. (R. 1333.) (Emphasis added.)
The evidence at trial also indicated that the attempted rape of J.F. and the abduction of Linda Talbert occurred within one hour of each other. Also, Lieutenant Jay Jones testified that he measured the distance between the two crime scenesthe Brown Realty Agency in Columbus, Georgia, and Flowers Bait Store in Smiths Station, Alabamaand found it to be 11.9 miles. Lieutenant Jones stated that he made two trips, which took him 22 and 24 minutes, respectively, between the two points.[5]
In short, the testimony of J.F. was properly admitted into evidence to prove the State's theory that the appellant was on a mission in committing these two acts, and, as the district attorney argued, that the appellant was "obsessed" and "frustrated" by the failed attempt and sought to take these feelings out on Linda Talbert. As we wrote in Lucy, 340 So.2d at 846:
"To show motive is also a frequent exception to the general rule. In this context, motive is employed to define the feeling or passion of the accused, which propelled him towards the commission of the charged crime. 1 McElroy § 70.12(4), at 185. Evidence of the collateral homicide is properly admitted for such a purpose. Hardy v. State, 51 Ala. App. 489, 286 So.2d 899 (1973).
"Earlier cases are in agreement with the use of such evidence to show motive, although the formulation of the purpose is not the same. Thus, it is often said that the evidence is admissible to show that the accused was `... in a reckless, dangerous, malicious mood,' Sims v. State, 253 Ala. 666, 46 So.2d 564 (1950), to show the `... hostile spirit which actuated defendant.' Granberry v. State, 182 Ala. 4, 62 So. 52 (1913), or to `... throw light upon the animus of the perpetrator.' Seams v. State, 84 Ala. 410, 4 So. 521 (1887)."
Finally, in balancing the obviously prejudicial effect of the challenged testimony with its probative value, we find that the scales tip in favor of the State and against this appellant. We, thus, hold that admission of J.F.'s testimony by the trial judge was proper and without error.

G
The appellant next argues that J.F. was impermissibly allowed to bolster her in-court identification of the appellant as her assailant. On direct examination, J.F. testified that, after the appellant attempted to rape her, she identified the appellant at the Lee County sheriff's office, as her assailant.
We initially note that no objection was made to this testimony at trial. Thus, to warrant reversal on this claim, we must find that the admission of this testimony constituted "plain error."
The appellant, in support of his position, cites this court to Fisher v. State, 439 So.2d 176 (Ala.Cr.App.), cert. denied (Ala. 1983).
"It is a settled principle of evidence that on direct examination a witness should not be permitted to corroborate his in-court identification by evidence of an earlier extrajudial identification. Carlisle v. State, 371 So.2d 975, 977-78 (Ala.Cr.App.1979). Only after an attack *525 upon the credibility of a witness's incourt identification, sufficient to raise an inference of misidentification, is evidence of an earlier, extrajudicial identification properly admitted. Gilham v. State, 382 So.2d 616, 619 (Ala.Cr.App.), cert. denied, Ex parte Gilham, 382 So.2d 619 (Ala. 1980); C. Gamble, McElroy's Alabama Evidence, Section 177.01(6)(a) (3rd ed. 1977). This is merely an application of the general rule that evidence is not admissible to sustain the credibility of a witness whose testimony has not been sought to be impeached. Funderberg v. State, 100 Ala. 36, 14 So. 877 (1893)."
Fisher, 439 So.2d at 177.
Our review of the record fails to reveal any reversible error associated with the admission of this evidence. While the record is devoid of any evidence pertaining to the manner or suggestiveness of the pre-trial lineup, we need not be concerned with this factor, since J.F.'s out-of-court identification was substantially based on independent evidence.
As our Supreme Court stated in Ex parte Stout, 547 So.2d 901, 904 (Ala.1989):
"When an in-court identification of the accused is shown to have a basis independent of any pre-trial identification, then it is correctly received into evidence. Coleman v. State, [487 So.2d 1380 (Ala.Crim. App.1986)]; Jackson v. State, 414 So.2d 1014 (Ala.Crim.App.1982); Matthews v. State, [401 So.2d 241 (Ala.Crim.App. 1981), cert. denied, 401 So.2d 248 (Ala. 1981)]."
See also Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (listing factors to consider in determining suggestiveness of a pre-trial identification"totality of circumstances," including opportunity to view accused at time of crime); Ball v. State, 522 So.2d 793, 795-96 (Ala.Cr.App. 1988) (discussing circumstances where witness viewed defendant at time of crime); Donahoo v. State, 371 So.2d 68, 72-73 (Ala. Cr.App.), cert. denied, 371 So.2d 74 (Ala. 1979) (discussing opportunity of a rape victim to view her assailant).
J.F. testified at trial that, shortly after she arrived at work on the morning of August 31, 1984, she heard a knock on the front door. She stated that the door was glass and that she could see the appellant standing there. She further stated that she unlocked the door, and that the appellant pushed his way into the building.
J.F. stated that the appellant, at gunpoint, then forced her into the kitchen, where he sodomized and attempted to rape her. She testified that the appellant told her not to look at him "because if I saw his face he was going to kill me." (R. 1470.)
She then testified:
"And I think it was about that time that I had my clothes off and he got on top of me and I opened my eyes just for a split second, and he said, `No, don't look at me. I'll kill you if you do.' And, you know, I said, `Please don't kill me.' It was hard not to open your eyes for a second. And I probably did that four or five different times." (R. 1470.)
J.F. next testified that he made her perform oral sex on him again. She stated that at this time she saw the pistol "out of the corner of [her] eyes" (R. 1417), lying on the floor. She claimed that she grabbed the pistol, pointed it at his stomach, and pulled the trigger, but that nothing happened. According to J.F., the appellant then took the gun from her, pointed it at her head, and pulled the trigger twice, but that again the gun did not fire.
Next, according to J.F., the appellant took her into the bathroom and made her perform oral sex on him a third time. After this, she stated, the appellant locked her in the bathroom and left. J.F. testified that the entire incident took about 20 minutes. (R. 1476.)
Based on this testimony, we hold that J.F. had an ample opportunity to observe this appellant and make an in-court identification of him independent of the pre-trial identification procedure conducted at the Lee County sheriff's department. The admission of her testimony was, thus, not reversible error.

H
The appellant claims that he was denied a fair trial because cumulative photographs *526 of the victim's decomposed and bloated body were introduced into evidence by the State and given to the jury for its inspection. He contends that the photographs were "particularly gruesome" (quoting the district attorney at R. 1706) and, thus, were improperly allowed into evidence, since their prejudicial effect outweighed their probative value.
Prior to trial, the appellant filed a motion to suppress certain photographs. During trial, when the district attorney sought to introduce the challenged photographs, the appellant restated his motion. On this motion, a hearing was held outside of the presence of the jury. During this hearing, the trial judge pointed out the duplicity of a couple of photographs. The district attorney, in response, withdrew the duplicates. The trial judge then found the other photos to be admissible, subject to a proper foundation being laid.
We have reviewed the photographs of the victim's body, and we agree that they are not pleasant to the eye. Nonetheless, each photograph depicts something different, whether it be a different angle or a different piece of evidence in support of the State's case.
We recently addressed the admission of gruesome photographs in Bankhead v. State, [Ms. 6 Div. 370, September 29, 1989] (Ala.Cr.App.1989):
"Generally, photographs are admissible into evidence in a criminal prosecution `if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.' Magwood v. State, 494 So.2d 124, 141 (Ala.Cr.App.1985), aff'd, 494 So.2d 154 (Ala.1986), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1987). See also Woods v. State, 460 So.2d 291 (Ala.Cr.App.1984); Washington v. State, 415 So.2d 1175 (Ala.Cr.App. 1982); C. Gamble, McElroy's Alabama Evidence § 207.01(2) (3d ed. 1977).
"It has long been the law in Alabama that `[p]hotographs which show external wounds in the body of a deceased victim, even though they are cumulative and based on undisputed matters, are admissible. The fact that they are gruesome is not grounds to exclude them so long as they shed light on the issues being tried.' Burton v. State, 521 So.2d 91, 92 (Ala. Cr.App.1987). See also Kinder v. State, 515 So.2d 55 (Ala.Cr.App.1986). The fact that a photograph is gruesome and ghastly is no reason to exclude it from the evidence, so long as the photograph has some relevancy to the proceedings, even if the photograph may tend to inflame the jury. Magwood v. State, supra, 494 So.2d at 141. See also Hutto v. State, 465 So.2d 1211 (Ala.Cr.App. 1984); Jones v. State, 439 So.2d 776 (Ala. Cr.App.1983); Godbolt v. State, 429 So.2d 1131 (Ala.Cr.App.1982)."
The appellant in Bankhead, like this appellant, argued that the photographs showed advanced decomposition of the body. Still, we held that the photographs were admissible. Brodka v. State, 53 Ala. App. 125, 298 So.2d 55 (1974), and cases cited therein.
We find no reason to hold otherwise in the cause sub judice. The trial judge did not abuse his discretion in admitting the photographs into evidence. The fact that the photographs may have "inflame[d] the minds of the jurors" did not warrant their exclusion. See Kuenzel, quoting Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, ___ U.S. ___, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See also Arthur, 472 So.2d at 659-60.
The appellant is not due to prevail on this claim.

VII
Section 15-12-21(d), Code of Alabama 1975, reads:
"(d) Counsel appointed in cases described in subsections (a), (b) and (c) above, including such cases tried de novo in circuit court on appeal from a juvenile proceeding, shall be entitled to receive for their services a fee to be approved by *527 the trial court. The amount of such fee shall be based on the number of hours spent by the attorney in working on such case and shall be computed at the rate of $40.00 per hour for time expended in court and $20.00 per hour for time reasonably expended out of court in the preparation of such case. The total fees to any one attorney in any one case, from the time of appointment through the trial of the case, including motions for new trial, shall not, however, exceed $1,000.00, except as follows: In cases where the original case involves a capital offense or a charge which carries a possible sentence of life without parole, the limits shall be $1,000.00 for out-ofcourt work, plus payment for all in-court work, said work to be billed at the aforementioned rates. Counsel shall also be entitled to be reimbursed for any expenses reasonably incurred in such defense to be approved in advance by the trial court. Retrials of a case shall be considered a new case." (Emphasis added.)
The appellant argues that the portion of the statute which limits his attorneys to $1,000.00 for out-of-court work is unconstitutional. The appellant, in his brief, notes that one of his attorneys, J. Michael Williams, Sr., performed 246.85 hours of out-of-court service, and another, Thomas E. Jones, performed 187.90 hours of out-ofcourt service in his behalf.
The appellant's arguments are summarized as follows:
(A) The preparation for a capital murder trial requires far more knowledge, experience, and preparation than the average trial.
(B) The current remuneration system violates both constitutional and statutory law of this State and of the United States.
(1) The limitation violates the separation of powers doctrine, in that the legislature has imposed limits on the judiciary on matters which are largely judicial functions i.e., determining how much defense attorneys should be compensated in a capital murder trial.
(2) The limitation amounts to an unconstitutional taking of the defense attorney's property.
(3) The limitation deprived the appellant of effective assistance of counsel.
(4) The limitation denied the appellant equal protection of the law, because the wealthy can better afford more competent counsel and can better pay the expenses associated with the preparation and trying of a case.
The appellant urges this court to strike down Alabama's compensatory system as it pertains to attorneys who are appointed in capital murder cases to represent indigent defendants. The appellant's attorneys urge us to remand this case to the trial court and order that they be compensated a reasonable amount for the unpaid portion of their out-of-court work.
The issues raised by the appellant have heretofore been addressed and resolved by the Supreme Court of Alabama in Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), and Sparks v. Parker, 368 So.2d 528 (Ala.1979). We agree with the Supreme Court's conclusion in Sparks, 368 So.2d at 534:
"This Court appreciates and is most sensitive to the plight of the attorneys of Calhoun County, shared by their brother and sister attorneys throughout the state, and finds that the failure of the legislature to provide adequate funds to compensate attorneys to the extent of the true value of their services is unjustifiable. Nevertheless, the statutes in question do not infringe upon the constitutional rights of appellants...."
In Grayson, the claims of equal protection, due process, and ineffective assistance of counsel were all addressed as they related to § 15-12-21(d). The Court found no constitutional violation and found against the claim of "ineffective assistance of counsel."
In so finding, the Court stated:
"These contentions are made on the premise that lawyers will not provide effective assistance unless paid a certain *528 amount of money. But the legal profession requires its members to give their best efforts in `advancing the "undivided interests of [their] client[s]".' Polk County v. Dodson, 454 U.S. 312, 318-19, 102 S.Ct. 445, 449-50, 70 L.Ed.2d 509 (1981). This Court, in Sparks v. Parker, 368 So.2d 528, 530 (Ala.1979), quoted the New Jersey Supreme Court as follows:
"`We know of no data to support a claim that an assigned attorney fails or shirks in the least the full measure of an attorney's obligations to a client. Our own experience, both at the bar and on the bench, runs the other way. A lawyer needs no motivation beyond his sense of duty and his pride. [State v. Rush, 46 N.J. 399, 405-07, 217 A.2d 441, 444-45 (1966).]'
"We reaffirm this belief that attorneys appointed to defend capital clients will serve them well, as directed by their consciences and the ethical rules enforced by the state bar association."
Grayson, 479 So.2d at 79-80.
We likewise find in the cause sub judice that the representation afforded this appellant was not ineffective or in any sense legally inadequate. It is our opinion that Williams and Jones did an admirable job in preparing for this trial, in trying this case, in preparing the briefs on appeal, and in arguing their client's position to this Court.
Furthermore, the appellant's attorneys' claim that the current system violates the separation of powers doctrine and constitutes an unlawful taking of their property was resolved in Sparks, 368 So.2d at 531-33. As for the "separation of powers" issue, the Supreme Court wrote:
"In Morgan County Commission v. Powell, 292 Ala. 300, 293 So.2d 830 (1974), the Court reiterated the principle of the separation of powers of government into three branches with separate functions, holding:
"`Within their respective spheres each branch of government is supreme. State v. Stone, 224 Ala. 234, 139 So. 328. Judicial power and legislative power are coordinate, and neither can encroach upon the other. Ex parte Huguley Water System, et al., 282 Ala. 633, 213 So.2d 799. The authority to determine the amount of appropriations necessary for the performance of the essential functions of government is vested fully and exclusively in the legislature. Abramson v. Hard, 229 Ala. 2, 155 So. 590. Section 72, Alabama Constitution of 1901, provides: "No money shall be paid out of the treasury except upon appropriation made by law * * *"'"
"It is therefore not within the sphere of the judicial branch to determine what appropriations are to be made although, of course, it would be within our purview to determine if the appropriations made are `adequate and reasonable' for the unified judicial system or so inadequate as to constitute the taking of property (services) without due process of law in the context of this case. We do not find such to be the case on this appeal."
Sparks, 368 So.2d at 531. And regarding the "taking" issue, the Supreme Court of Alabama opined:
"Therefore, although the statutory compensation which exists in most states usually contains limitations which in most cases prevent a lawyer from receiving what his time is worth, constitutional standards of just compensation have generally been found inapplicable. A Fifth Amendment `taking' of property does not occur when the state simply requires an individual to fulfill a commitment he has made. Kunhardt & Co. v. United States, 266 U.S. 537, 45 S.Ct. 158, 69 L.Ed. 428 (1925); Hurtado v. United States, 410 U.S. 578, 93 S.Ct. 1157, 35 L.Ed.2d 508 (1973). An applicant for admission to practice law may rightfully be deemed to be cognizant of the traditions of the profession which he is joining, and to know that one of these traditions is that a lawyer is an officer of the court obligated to represent indigents for little or no compensation upon court order.
"In Powell v. Alabama, 287 U.S. 45, 53, 53 S.Ct. 55, 65, 77 L.Ed. 158, 172 (1932), the United States Supreme Court found that attorneys were obligated to *529 accept compulsory appointments to defend indigent defendants, stating:
"`Attorneys are officers of the court, and are bound to render service when required by such appointment.'
"Reinforcing this view of the lawyer's obligation to represent indigent defendants is the unique position of the Alabama Bar Association and the Board of Bar Commissioners as this Court pointed out in Wright v. Turner, 351 So.2d 1, 4 (Ala.1977):
"`Members of the Board of Bar Commissioners do have some functions which derive directly from legislative enactments. See Tit. 46, § 25, Code of Alabama 1940. It is clear, however, from the terms of the Code that their duties are, for the most part, dependent upon Supreme Court approval.
"`This dependency was underscored in the opinion authored for the Court by Justice Shores in Board of Commissioners, Alabama State Bar v. State ex rel. Baxley, 295 Ala. 100, 109, 324 So.2d 256, 262 (1975): "Although the Board (of Bar Commissioners) was created by the legislature, it was created as an arm to this court and any action by the Board is subject to review or approval by this court. The legislature has not created an entity which is not subject to control or regulation[;] the Board is subject to the control of this court.'
"As an `arm of the court' the Board of Bar Commissioners, and consequently the members of the Alabama State Bar as well, enjoy certain state privileges. Although the members of the Board receive neither salary nor emolument by virtue of their membership on the Board, they do receive reimbursement of actual expenses from the state and the members of the state bar benefit from the services so provided. A concomitant obligation upon the bar of this state is to furnish legal services to indigents at the statutory compensation provided in order to enable the state to discharge its duty to provide adequate representation for indigent defendants imposed upon the state by Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); U.S. v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967); Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (juveniles).
"While the furnishing of services without just compensation might not be demanded of a citizen who is not an officer of the court or who does not enjoy special privileges from the state or who is not otherwise required to fulfill a commitment to the state, members of the Alabama Bar are in a unique position and, for this reason, are obligated to render their services for limited compensation."
Sparks, 368 So.2d at 532-33.
Therefore, on the authority of Grayson and Sparks, neither the appellant nor his attorneys are due to prevail on this issue.

VIII
We have reviewed the appellant's conviction and sentence of death as required by Beck v. State, 396 So.2d 645 (Ala.1980), and § 13A-5-53, Code of Alabama 1975.
We find that the appellant's conviction was supported by legal evidence and that his sentence was not based on improper influences, such as passion, prejudice, or other arbitrary factors. Nor was the sentence of death excessive or disproportionate to the penalty imposed in similar cases, considering both the facts and circumstances of this crime and this defendant. See Kennedy v. State, 472 So.2d 1092, 1105 (Ala.Cr.App.1984), aff'd, 472 So.2d 1106 (Ala.1985).
*530 We have also reviewed the trial judge's sentencing order and agree with his findings. The aggravating circumstances outweigh the mitigating circumstances, especially since the appellant offered no mitigating circumstances to offset those aggravating circumstances presented by the State in this cause.
We have further searched the record in an attempt to find any error which might have adversely affected this appellant's substantial rights and have found none. Hooks v. State, 534 So.2d 329, 351-52 (Ala. Cr.App.1987), aff'd, 534 So.2d 371 (Ala. 1988); Rule 45A, A.R.A.P.
The appellant's conviction and sentence of death are thus due to be, and they are hereby, affirmed.
AFFIRMED.
All the Judges concur.
BOWEN, J., concurs specially with opinion.
BOWEN, Judge, concurring specially.
I concur specially in the opinion of the majority.
With regard to Part VI.C.2. of that opinion, a reading of the cases cited by the majority convinced me that the prosecutor's argument constituted reversible error. The majority omits a crucial portion of the opinion in Berard v. State, 486 So.2d 476, 478-79 (Ala.1985):
"We have not been cited to any case in Alabama that approves of a prosecutor's asking a question about what the defendant is capable of doing in the future. We additionally note that this Court has previously stated that, as long as a prosecutor does not comment on the possibility that the defendant will commit future illegal acts, he may legitimately argue to the jury the need for law enforcement as a deterrent to crime. Ex parte Waldrop, 459 So.2d 959, 962 (Ala.1984); Cook v. State, 369 So.2d 1251, 1255 (Ala. 1979). It would seem to be much more prejudicial to a defendant to allow the prosecutor to elicit this kind of testimony from a defense witness than it would be for the prosecutor to merely comment on that possibility in closing argument."
However, I find no reversible error for the following reasons:
All but one of the prosecutor's "he will kill again" comments occurred at the sentencing phase of the trial. "Future dangerousness" is a proper consideration in a capital sentencing scheme. Jurek v. Texas, 428 U.S. 262, 275, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) ("And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose."); Gregg v. Georgia, 428 U.S. 153, 183, n. 28, 96 S.Ct. 2909, 2930, n. 28, 49 L.Ed.2d 859 (1978) ("[The death penalty has been said to serve the purpose of] incapacitation of dangerous criminals and the consequent prevention of crimes that they may otherwise commit in the future."); Spaziano v. Florida, 468 U.S. 447, 461-62, 104 S.Ct. 3154, 3163, 82 L.Ed.2d 340 (1984) ("Although incapacitation has never been embraced as a sufficient justification for the death penalty, it is a legitimate consideration in a capital sentencing proceeding."). See also Brooks v. Kemp, 762 F.2d 1383, 1411-12 (11th Cir.1985), 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986).
However, while the prosecutor's single comment at the guilt phase on the future dangerousness of the defendant was improper, it "did not so infect the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 180, n. 10, 106 S.Ct. 2464, 2471, n. 10, 91 L.Ed.2d 144 (1986). This is especially true in this case where there was evidence that the defendant continued his violent criminal activities after the commission of the charged capital offense.
NOTES
[1] All times are Eastern Standard Time (EST) unless otherwise indicated, because the record indicates that Smiths Station, Alabama, the community where this crime occurred, uses this time, apparently because of its closeness to the Georgia line.
[2] The appellant's automobile was a former Columbus, Georgia, police car, which the appellant bought at an auction in Columbus. Robley Evans, fleet manager with Columbus Consolidated Government, testified that Goodyear Blue Streak radials were on the automobile when it was sold at auction. Margaret Smith, the appellant's wife, testified that two of the tires were replaced following the purchase of the automobile.
[3] The appellant's wife denied that she and the appellant had argued on August 31, 1984.
[4] J.F. testified that, at the time of the attack against her, her husband was a police officer with the Columbus Police Department.
[5] The appellant's former step-son-in-law also measured this distance. He testified that it was 24 miles and took him 35 minutes to travel between the points.